## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CASE NO. |
| MIEKA ENERGY CORPORATION, VADDA ENERGY CORPORATION, DARO RAY BLANKENSHIP, ROBERT WILLIAM MYERS, JR., and STEPHEN ROMO, | § § § § § | |
| Defendants. | § § § § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files this Complaint against Defendants Mieka Energy Corporation ("Mieka"), Vadda Energy Corporation ("Vadda"), Daro Ray Blankenship ("Blankenship"), Robert William Myers, Jr. ("Myers"), and Stephen Romo ("Romo") (collectively, "Defendants"). The Commission alleges:

## SUMMARY

1.     Blankenship and his company, Mieka, violated the anti-fraud provisions of the federal securities laws when, beginning in September 2010, they marketed to members of the general public nationwide, through extensive boiler-room cold calling, investments in a purported joint venture that would conduct oil and gas exploration, drilling and production activities. Blankenship, through entities he controls and salespersons he directs, convinced at least 60 investors in multiple states to invest $4.4 million, luring them with projected returns on

investment to be achieved through his, and his "team's," claimed expertise in managing oil and gas enterprises.

2.      In an effort to evade federal securities regulations, Blankenship and Mieka labeled their securities offering a "joint venture," and claimed that the investment interests they were offering and selling were not securities.  In reality, the interests in the purported joint venture, entitled "2010 MIEKA PA WestM / MARCELLUS PROJECT II" ("2010-JV"), were securities under federal law.

3.      Myers and Romo were two Mieka salespersons who offered and sold the 2010-JV interests and were compensated for their sales efforts with commissions.  Myers has not been registered with the SEC as a broker-dealer or associated with a broker-dealer registered with the SEC since 1984.  Romo has never been registered with the SEC in any capacity, or associated with an SEC-registered broker-dealer.

4.      Blankenship prepared and disseminated to prospective investors written offering materials, including a Confidential Information Memorandum ("CIM").  According to the CIM, the purpose of the offering was to "drill, test and complete" two gas wells -- one horizontal and one vertical -- in Pennsylvania.  The investors were to receive, in return, production revenue from the wells.  However, Defendants failed to use the offering proceeds as promised.  Instead, Defendants spent the investors' proceeds -- almost from the beginning -- on business expenses and projects unrelated to the joint venture; as a consequence, there was scant money left to drill, test, and complete the wells as promised.  In fact, Defendants never drilled the horizontal well.  And while the Defendants drilled the vertical well, they never completed it, because they failed to connect it to the nearest gas transmission line.  As a result, they could not gather any gas from the well for sale.

5.      After the investor proceeds were mostly gone, Blankenship engaged in a scheme to conceal from both the investors and the general public his misuse of the funds.  He wrote and sent to the investors misleading update letters, which indicated, falsely, that the wells had been drilled and completed or would be drilled and completed in the near future.  Blankenship also concealed the fraud from the general public in the periodic reports Mieka's public parent company, Vadda, filed with the SEC.  According to the false disclosures in the reports, the wells had been drilled and completed, or were nearing completion.  Blankenship signed and falsely certified the accuracy of those reports.

6.      Of the $4.4 million raised, Blankenship and Mieka spent only $850,875, or 21% (after payment of 10% commissions) for the purposes for which the money was raised -- drilling, testing, and completing two gas wells.  Rather than use it for the reasons promised, Blankenship and Mieka diverted most of the funds.  More particularly, they misspent the funds as follows: $936,293 on a previous oil and gas project Mieka sold in 2009 and 2010 to prior investors; $809,592 on an oil and gas project Mieka sold in 2011 and 2012 to other, later investors, in an offering that began after the 2010-JV offering; the remaining amount (approximately $1.4 million) on various expenses of Mieka and Vadda that were not included within the authorized expenses disclosed in the CIM.  These misallocations included: office expenses, advertising, payroll, legal services, utilities, rent/mortgage, country club dues, credit card bills, and taxes. Blankenship and Mieka began misspending the investors' funds on the unauthorized expenses in December 2010, two months into the offering, and continued to do so for the duration of the offering.  Blankenship controlled Mieka and was responsible for how it spent, and misspent, the funds.

7.      As a result of their actions, Blankenship, Mieka, and Vadda violated the antifraud

provisions of the federal securities laws, including Section 17(a) of the Securities Act of 1933

("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")

and Exchange Act Rule 10b-5.  In addition, Vadda violated the reporting obligations set out in

Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13. In turn,

Blankenship aided and abetted those violations and violated the certification requirement

provided in Exchange Act Rule 13a-14.  Blankenship is also liable for his conduct as a control

person of Mieka and Vadda under Section 20(a) of the Exchange Act.  Finally, Myers and Romo

violated Section 15(a) of the Exchange Act through their actions.  As a result, the Commission

seeks injunctive relief against all of the defendants, including an order prohibiting Blankenship

from soliciting any individual or entity to purchase or sell securities and participating in any oil

and gas-related securities offering.  The Commission further seeks an officer-and-director bar

against Blankenship and orders requiring all of the Defendants to disgorge their ill-gotten gains

and pay monetary civil penalties.

## JURISDICTION AND VENUE

8.      Defendants offered and sold interests in the Texas joint venture, 2010-JV.  These

interests constituted securities under Section 2(1) of the Securities Act [15 U.S.C. § 77b(a)(1)]

and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

9.      This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]

and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts,

practices, and courses of business described herein occurred within the jurisdiction of the Northern District of Texas.

11.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

## DEFENDANTS

12.     **Mieka** is a Delaware corporation wholly owned by Vadda Energy Corporation. Its principal place of business is in Flower Mound, Texas.  Mieka is the Managing Venturer for the 2010-JV joint venture.  Between 2001 and November 2009, Mieka conducted 27 joint venture offerings and raised $32.7 million.[1]  The company has never registered an offering of securities with the Commission under the Securities Act or a class of securities under the Exchange Act.  Mieka has never been registered with the Commission in any capacity.

13.     **Vadda** was incorporated in Florida in May 1997 and shares its office with Mieka in Flower Mound, Texas.  Vadda has never registered an offering of securities with the Commission under the Securities Act.  On July 5, 2011, it registered its common stock by filing a Form 10 registration statement with the Commission.  Vadda's stock has never been actively traded.  Vadda has never been registered with the Commission as a broker-dealer or investment adviser.

14.     **Blankenship**, age 67, lives in Flower Mound, Texas.  He is the founder and Managing Director of Mieka.  Since April 2009, he has been the President and CEO of Vadda. Daro Blankenship and his wife jointly own 79.6% of the issued and outstanding shares of Vadda.

---

[1]     On December 30, 2009, Mieka, Vadda, and the numerous Mieka-sponsored "joint ventures" were merged. Vadda acquired the assets and assumed the liabilities of the ventures; Mieka became a wholly-owned subsidiary of Vadda; and the joint venture investors became shareholders of Vadda.

Blankenship was the subject of a May 2005 cease-and-desist order issued by the Indiana

Securities Commissioner and an April 2011 cease-and-desist order issued by the Colorado

Securities Commissioner.  The Indiana order was based on findings of transactional and broker-

dealer registration violations, as well as antifraud violations by Mieka and Blankenship.  The

Colorado order was based on findings of transactional and broker-dealer registration violations

by Mieka, Blankenship and Stephen Romo in connection with the securities offering at issue in

the instant case – the 2010-JV.  Blankenship has never been registered with the Commission in

any capacity, or associated with any SEC-registered entity, including any broker-dealer.

      15.      **Myers**, age 70, of Dallas, Texas is Mieka's Vice President of Project

Development.  He offered and sold by phone the 2010-JV interests and received approximately

$121,466 in transaction based commissions from selling 2010-JV interests.  From 1974 to 1981,

Myers was executive vice president and part owner of the Commission-registered broker-dealer

Federal Energy Corporation.  From 1981 to 1984, Myers was CEO, president and owner of the

Commission-registered broker-dealer Janus Securities, Inc.  Myers has not been registered with

the SEC in any capacity, or associated with any SEC-registered entity, including any broker-

dealer, since 1984.  After closing Janus in 1984, Myers was self-employed through 2004, when

he joined Mieka.

      16.      **Romo**, age 50, of The Colony, Texas, offered and sold by phone the 2010-JV

interests.  He received approximately $69,962 in transaction-based (commissions) during the

relevant period.  Romo was a licensed real estate broker from 1992 through 2003.  He has never

been registered with the Commission in any capacity, or associated with any SEC-registered

entity, including any broker-dealer.  In April 2011, the Colorado Securities Commissioner

ordered him, in connection with his offers and sales of the 2010-JV interests, to cease and desist

from committing or causing violations of Colorado's transactional and broker-dealer registration provisions.

## RELATED ENTITY

17.    **Mieka LLC,** a Delaware limited liability company, is described in Vadda's SEC filings as an "affiliate" of Mieka, and as owned by Blankenship and his wife Anita Blankenship. According to Vadda's filings, Mieka LLC's "only source of revenue is from the drilling of oil and gas wells contracted with [Mieka] through certain turnkey contracts." According to the 2010-JV offering materials, Mieka LLC is the "Operator of the Prospect Wells."

## FACTUAL ALLEGATIONS

I.    **The purported joint venture interests offered by Mieka are securities.**

18.    The 2010-JV interests offered and sold by the Defendants are investment contracts, and therefore are securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Investors in this offering made an investment of money, in a common enterprise, with an expectation of profits to be derived solely from the efforts of Blankenship and his related entities, Mieka and Mieka LLC.

    A.    **Blankenship, Mieka, Myers and Romo marketed the oil and gas well investment to the general public.**

19.    In September 2010, the Defendants began offering and selling the 2010-JV interests to the general public through a sales staff of cold-callers who were provided purchased investor lead lists. Blankenship hired and supervised the cold-callers, including Myers and Romo. Individual investors sent money to Mieka by mailing in checks. They expected that their investments would be pooled with the funds of other investors in the 2010-JV. Investors were pitched these investments by unregistered salespersons, who emphasized the unique qualifications of Blankenship, Mieka and Mieka LLC as experienced oil and gas operators.

Investors anticipated returns based on the future production of "turnkey" gas wells, and expected their profits to come solely from the efforts of Blankenship, Mieka and Mieka LLC. Blankenship and Mieka represented that they would arrange and pay for drilling, testing, and completing a horizontal and a vertical gas well in the Crabtree prospect in Westmoreland County, Pennsylvania, and that they would distribute gas production revenue to the investors.

20.    The salesmen, including Myers and Romo, called from Mieka's offices, were supervised by Blankenship, and were paid commissions for sales. If a prospective investor expressed interest in 2010-JV, the sellers informed Mieka's administrative staff, which mailed an offering package to the prospect.

21.    Neither Myers nor Romo was an associated person of a registered broker-dealer during their offers and sales of the 2010-JV interests. During their cold calls, Myers and room gave prospective investors advice about the merits of the offered interests and took orders after successfully closing a sale. Myers received at least $121,466 in transaction-based compensation, or commissions, based on his sales. Romo received at least $69,962 in such transaction-based compensation.

**B.    Despite the drafting of organizational documents to suggest active participation by venturers, Blankenship and Mieka sought and expected passive investors for the 2010-JV offering.**

22.    The offering package contained brochures, newspaper and magazine excerpts, a Confidential Information Memorandum ("CIM"), a Joint Venture Agreement, a subscription agreement, and an investor questionnaire. Blankenship prepared the brochures, the newspaper and magazine excerpts, and supplied all the facts included in the CIM and the Joint Venture Agreement.

23.     Although the 2010-JV was called a joint venture, the investors were nothing more

than passive investors wholly dependent on the efforts of Mieka and Blankenship to operate the

venture and generate profits.  The investors were numerous, geographically dispersed, lacked

expertise in oil and gas operations, and had no prior relationship with each other.  And while the

Joint Venture Agreement ("JVA") purported to vest management and control of the venture's

affairs, property, business, and operations with the investors, the JVA designated Mieka as the

Managing Venturer, with management control over the day-to-day operations of the venture,

including without limitation 13 expansive categories of managerial control.  Indeed, in practice,

Blankenship and Mieka did not consult with any of the investors on any decisions.  As further

evidence of Mieka's control, Mieka was obligated to obtain investor consent on only a few

extraordinary issues, such as assigning the venture's property in trust for the benefit of creditors,

or confessing a judgment, and a vote of 60% of the joint venture interests was required to replace

Mieka as the Managing Venturer.  As a result, Blankenship, through his control of Mieka,

controls every aspect of the 2010-JV's operations: hiring, supervising, and firing employees and

experts such as geologists and petroleum engineers; leasing offices; signing checks; identifying

oil and gas leases for acquisition; negotiating for purchase and purchasing the leases; deciding to

conduct offerings and preparing the offering materials; and engaging drilling, testing and

completion contractors.

24.     In addition, the investors had no access to the names and contact information of

the other investors, thus making collective participation in management of the joint venture

illusory.  Indeed, The JVA permitted Mieka to restrict access to the joint venture's records,

reducing any chance that the joint venturers could collaborate and exercise control.  Thus,

because the joint venturers were unable to exercise meaningful control, and because they were

dependent on the efforts of Mieka to generate profits, the joint venture interests constitute

securities under the federal securities laws.

**C.     At the time the agreements were entered into, investors had no reasonable
expectation of significant control over their investment.**

25.     Under the terms of the 2010-JV offering, all decisions made by Mieka as the

Managing Venturer were binding on the joint venture, but investors could not bind the joint

venture or act on its behalf.

26.     From the outset of the investment, investors had no control over the price, terms,

and contracting entity responsible for the pivotal work underpinning the investment -- the

turnkey drilling and completion contracts.  Blankenship, not the investors, set both the contract

terms and the prices for the turnkey drilling contract and completion contract with his company

Mieka LLC.  Blankenship -- without any input from investors and before the first investor

purchased an interest -- selected Mieka LLC as the counterparty to the turnkey contracts.

27.     The JVA provides that votes of the partners may be taken by written consent, and

that, unless otherwise provided, a simple majority of the units is sufficient to approve a matter

submitted to a vote.  But other than removal of the Managing Venturer, which requires a vote of

60% of the interests, the JVA delegates to the investors virtually no managerial input.  The few

discretionary powers which the JVA allows the investors -- assignment of the JV property for the

benefit of a creditor, confession of judgment, disposition of goodwill, and submission of claims

to arbitration or litigation – all require unanimous approval.  Meanwhile, all access to

information regarding the JV is controlled by Mieka as the Managing Venturer, who can

condition disclosure of the books, records, and reports upon a showing of a "proper purpose" by

the investor.  As for the definition of vague or ambiguous terms and expressions within the JVA

such as "proper purpose," the JVA expressly vests Mieka with sole discretion over their interpretation.

28.     Several barriers obstruct the investors' ability to exercise their power of removal of Mieka as Managing Venturer.  Mieka could restrict access to the JV's books and records, thus preventing investors from communicating with one another to marshal the required 60% votes. Further, the investors are numerous, geographically dispersed, and have no prior relationship to one another, which also impedes their ability to organize and exercise their removal power.  All ostensible input or avenues of control afforded the investors by the JVA were illusory.

29.     Investors had no access to information except through Blankenship, and no way of initiating a vote.  It was, therefore, impossible for investors to confer with each other and organize to vote to replace Mieka.

30.     Mieka was entitled under the JVA to execute documents and hold interests in its own name.  Thus, if the 2010-JV partners tried to remove Mieka, they would not have possessed the working interest in oil and gas leases necessary to develop the two wells.  As a result, from the outset of the investment, the investors had no realistic alternative to Mieka as Managing Venturer.

31.     As a condition to "acceptance" as an investor in the 2919-JV, the JVA required the purchaser to agree to the JVA as written, including the appointment of Mieka as Managing Venturer.  Prospective investors had no ability to negotiate the terms, which were presented on a "take it or leave it" basis.

32.     Blankenship did not solicit investors' votes on even one occasion before he misused their funds -- in a manner inconsistent with the CIM's Use of Proceeds stipulations -- to pay the following: $936,293 on an oil and gas project Mieka sold in 2009 and 2010 to previous

investors; $809,592 on an oil and gas project Mieka sold in 2011 and 2012 to other, subsequent

investors, in an offering that began after the 2010-JV offering; the remaining amount

(approximately $1.4 million) on various unauthorized expenses of Mieka and Vadda, including

office expenses, advertising, payroll, legal services, utilities, rent/mortgage, country club dues,

credit card bills, and taxes.

33.     The Defendants did not seek out investors with managerial experience in oil and

gas drilling operations and instead marketed the investments to the general public, ultimately

raising $4.4 million from 60 investors in multiple states.  Those who purchased the investments

were scattered throughout the United States, had no prior relationships with or contact

information for each other, and lacked experience in and knowledge about oil and gas

exploration.  Thus, investors were utterly dependent on Blankenship's efforts for profits, as they

understood from the outset of the investment.

34.     Thus, notwithstanding the language in the organizational documents suggesting

otherwise, from the inception of their investment, investors had no reasonable expectation of

control over their investment.

**II.     Blankenship, Mieka, and Vadda Made Material Misrepresentations and Omissions.**

    **A.     Project costs and Mieka's fee**

35.     The CIM, which Blankenship prepared and disseminated, informed investors that

$4.4 million would be raised in proceeds from the sale of joint venture interests.  It further

assured investors that those funds would be used to drill, test, and complete a horizontal and a

vertical gas well in the Crabtree prospect in Westmoreland County, Pennsylvania.  In addition,

the CIM authorized Mieka to use proceeds to pay offering and organizational costs.

36.     The CIM further established Mieka's fee for the project: it would be the remainder of the $4.4 million raised after deducting (1) the offering and organizational costs and (2) the "*actual costs*" of drilling, testing, and completing the two wells. Thus, pursuant to the CIM, Mieka could not know what its fee would be until after the two wells had been drilled, tested, and completed. And if Mieka and Blankenship could not even know what Mieka's fee would be until that time, it was not allowed to spend that fee (which had not yet been earned) before completing all the promised work. As discussed below, Mieka spent, while the offering was ongoing, the vast majority of the 2010-JV offering proceeds on unrelated expenses and projects, without ever completing the vertical well or even beginning to drill the horizontal well.

37.     According to the CIM,  Mieka was to enter a turnkey agreement with its affiliate, Mieka, LLC, pursuant to which Mieka would pay Mieka, LLC $2.575 million to drill, test, and complete the two proposed Pennsylvania wells.  Mieka had estimated that the proposed drilling, testing, and completion costs would be $1.8 million for the horizontal well and $775,000 for the vertical well.  The CIM disclosed that the $1.8 million cost estimate related to the horizontal well, thereby also making it clear to investors that the cost associated with the vertical well would be $775,00. The CIM stated that while Mieka was authorized to request additional funds from investors if  the costs on the horizontal well exceeded the $1.8 million, it could not seek such new funds if it incurred cost overruns related to the vertical well; instead, Mieka was required to bear those additional expenses.

38.     As Blankenship knew, neither the vertical or horizontal well would have any value to an investor if the well was not connected to a pipeline.  In other words, by asking investors to invest, Mieka and Blankenship assured them that Mieka was obligated to connect the wells to a pipeline.  Without a pipeline connecting the wellhead to a transmission line, any gas

produced could not be delivered to a purchaser and the wells would have been of no value to the investors.

39.     The vertical well that Mieka proposed to drill was approximately five miles from the closest gas transmission line.  Mieka obtained an estimate of $450,000 to construct a connecting pipeline.

**B.      Instead of completing the promised work, Blankenship and Mieka diverted investors' funds to other purposes.**

40.     From September 2010 through October 2011, Mieka sold interests in 2010-JV to approximately 60 investors nationwide, raising $4,435,200.

41.     Of the $4,435,200 raised, Mieka spent approximately $440,000 on organizational and offering expenses, primarily commissions paid to the salesmen. That left approximately $4 million for Mieka to perform the tasks it contracted to perform, including payment of at least $2.575 million to Mieka, LLC  to drill, test, and complete the two wells.  Presumably, once it had paid the $2.575 million for the drilling, testing, and completion work, and assuming there were no cost overruns on the vertical well, then Mieka would have been entitled to any remaining offering proceeds as its fee.

42.     Contrary to the representations made to investors, Mieka did not drill the horizontal well. And, while it did more work on the vertical well, its activities were of no use to investors because it never constructed the pipeline to connect it to the nearest gas transmission line. Mieka spent a total of $850,875 on the mandatory development activities. After deducting the sales commissions, that amount represents only 21.3% of the $4 million raised to spend on the wells.

43.     Mieka and Blankenship immediately began spending the remaining approximately $1.3 million of investors' proceeds on non-authorized expenses.  For example, Blankenship and Mieka:

- spent $936,293 to fund work on an unrelated oil and gas project Mieka sold in 2009 and 2010 to earlier investors;

- spent $809,592 to fund work on an oil and gas project Mieka sold in 2011 and 2012 to other, later investors, in an offering that began after the 2010-JV offering;

- spent the remaining amount (approximately $1.4 million) on various unauthorized expenses of Mieka and Vadda, including office expenses, advertising, payroll, legal services, utilities, rent/mortgage, country club dues, credit card bills, and taxes.

Mieka began spending the investors' funds on the non-authorized expenses in December 2010, two months into the offering, and continued to do so for the duration of the offering. Blankenship controlled Mieka and was responsible for how it spent, and misspent, the funds.

44.     Blankenship knew that the $3.1 million he spent on other items could not have been Mieka's "fee," since Mieka was not entitled to a fee until *after* it had incurred the *actual costs* to drill, test, and complete, the two wells.  Blankenship treated the investor proceeds as if they were Mieka's own money.  Mieka and Blankenship did not track the 2010-JV expenses, and they did not reserve sufficient funds to drill and complete the two wells.

**C.     Blankenship and Mieka concealed the misuse of funds and Mieka's failure to perform as promised.**

45.     While the 2010-JV offering was ongoing, Blankenship began concealing his misuse of the investors' proceeds.  He drafted, signed, and sent a series of update letters, including letters dated June 15, 2011, March 20, 2012, and May 21, 2012, in which he

misrepresented Mieka's actions and the status of the project.  These letters were false.  For example:

- In the June 15, 2011 letter, while the 2010-JV offering was ongoing, Blankenship stated that the lease on which Mieka proposed to drill had "immediate access to a pipeline," when, as Blankenship knew, in fact the nearest pipeline was five miles from the vertical well and Blankenship had no plans to construct the connecting pipeline.  As of that date, Blankenship had already diverted $2,674,142 of the $4 million.

- In the March 20, 2012 letter, Blankenship stated that pipe was being laid to hook up one well to the meter and that process would be completed in about 3 to 4 weeks.  In fact by this date, as Blankenship knew, Mieka had only $9,300 remaining of investors' funds, which was completely inadequate to pay the $450,000 estimated cost of the connecting pipeline.

- In the May 21, 2012 letter, Blankenship stated that Mieka had drilled several wells and had begun developing the pipeline system and that well should be hooked-up and online in the next 90 days, when in fact Blankenship had no money left to construct the five-mile pipeline connection, and no intention or plan for connecting to the pipeline.

46.     In addition to sending misleading update letters to investors, Blankenship concealed these fraudulent activities and made additional material misrepresentations through Vadda's public filings with the Commission  Vadda was dependent on Mieka's operations because Vadda's primary source of revenue flowed from fees Mieka collected as a result of its drilling activities.  Therefore, Vadda's public filings contained summaries of Mieka's operations. Specifically, Vadda's 2011 Form 10-K and its First Quarter, Second Quarter, and Third Quarter

2012 Forms 10-Q contained summaries of Mieka's 2010-JV's operations.  Blankenship signed and certified each of these filings in his capacity as President and CEO of Vadda; he also supplied the facts for summaries in those filings describing Mieka's activities, and more particularly, the operations of the 2010-JV.  Each of these filings contained material misrepresentations and omissions.  For example:

- On April 16, 2012, Vadda filed its 2011 Form 10-K, in which Blankenship and Vadda represented that Vadda owned a carried working interest in two natural gas wells, one of which was the 2010-JV horizontal well.  As Blankenship (and as a result Vadda) knew or was severely reckless in not knowing, the horizontal well did not exist, then or now, as it was never drilled, and consequently this statement was materially false.  Likewise, this statement did not disclose true nature of Mieka's operations, and this omission was material as well.

- In the same Form 10-K, Vadda and Blankenship and Vadda stated that Mieka expected to complete the vertical well by the end of the second quarter of 2012.  While Mieka drilled the vertical well, it did not "complete" the well, because it never built the connecting pipeline.  Moreover, as Blankenship knew or was severely recklessness in not knowing, there was no money or plan to construct the pipeline in the second quarter of 2012.

- Blankenship and Vadda also misrepresented its ownership interest in the non-existent horizontal well in its 2012 Form 10-Q reports filed on May 18, 2012, August 14, 2012, and November 14, 2012.  Additionally, in the reports, Blankenship and Vadda falsely referred to the vertical well as having been successfully completed, when in fact (as each knew or was reckless in not knowing), it was not because, without the

connecting pipeline, there was no way to market any gas produced.  Moreover,

throughout 2012, Blankenship and Mieka had no money or plan to construct the pipeline.

Blankenship, as the CEO of Vadda, was responsible for these misleading public reports.  He

reviewed them for accuracy, and he supplied the facts used to prepare them.  He signed them and

certified that the information contained within them was true and correct and that no material

information was omitted.

47.     Mieka and Blankenship continued to mislead investors even after they learned

that the Commission was investigating the offering.  In a March 13, 2013 letter to the investors,

five months after receiving the Commission's initial investigative subpoena, Blankenship

admitted to the investors for the first time that Mieka had not yet begun to drill the horizontal

well.  However, instead of truthfully saying he had misspent the money and that no money

remained to pay for drilling the well, he blamed Mieka's failure to drill on "low and stagnant gas

prices."  In the letter, Mieka offered to substitute the investors' interests in the promised

Marcellus horizontal well for two horizontal wells to be drilled in a different formation in New

York.  In contrast, Blankenship did not, in the letter, offer to substitute the investors'

uncompleted vertical well for any other well(s).  And Blankenship has never offered to refund

the investors their money.

### III.     Myers and Romo each acted as an unregistered broker.

48.     Section 15(a)(1) of the Exchange Act prohibits a broker or dealer from using

jurisdictional means such as the telephone or mails to effect transactions in securities unless the

broker or dealer is registered with the SEC.  Section 3(a)(4) of the Exchange Act defines a

"broker" as any person who is engaged in the business of effecting transactions in securities for

the account of others.

49.     Myers and Romo used the telephone and the mails to actively solicit investors to purchase interests in the 2010-JV securities, and they thereby affected purchases and sales of securities for the accounts of others.

50.     During the relevant period, Myers and Romo offered and/or sold interests in the 2010-JV while not registered as a broker-dealer with the SEC or affiliated with a broker-dealer registered with the SEC.

51.     Myers and Romo received transaction-based compensation in the form of sales commissions based upon a percentage of the amount of investor funds raised.

## CLAIMS FOR RELIEF

### First Claim

### Fraud –Violations of Section 17(a) of the Securities Act

### (Mieka and Blankenship)

52.     The Commission repeats and re-alleges *verbatim* Paragraphs 1 through 51 of the Complaint as if fully set forth herein.

53.     By engaging in the conduct described herein, Defendants Mieka and Blankenship directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails:

(a)     employed devices, schemes or artifices to defraud;

(b)     obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon purchasers of securities, prospective purchasers,

and other persons.

54.     With regard to their violations of Section 17(a)(1) of the Securities Act,

Defendants Mieka and Blankenship acted intentionally, knowingly or with severe recklessness

with respect to the truth. With regard to their violations of Sections 17(a)(2) and 17(a)(3) of the

Securities Act, Defendants Mieka and Blankenship acted at least negligently.

55.     By engaging in this conduct, Defendants Mieka and Blankenship violated, and

unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q].

### Second Claim

**Fraud – Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 thereunder**

**(Mieka, Vadda, and Blankenship)**

56.     The Commission repeats and re-alleges *verbatim* Paragraphs 1 through 51 of the

Complaint as if fully set forth herein.

57.     By engaging in the conduct described herein, Defendants Mieka, Vadda, and

Blankenship, directly or indirectly, singly or in concert, by the use of the means or

instrumentalities of interstate commerce, or of the mails, or of the facilities of a national

securities exchange, in connection with the purchase or sale of securities, knowingly or

recklessly:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; and

(c)  engaged in acts, practices, or courses of business which operated or would operate

as a fraud or deceit upon purchasers of securities and upon other persons.

58.  Defendants Mieka, Vadda, and Blankenship engaged in this conduct intentionally,

knowingly or with severe recklessness with respect to the truth.

59.  By engaging in this conduct, Defendants Mieka, Vadda, and Blankenship

violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### Third Claim

### Aiding and Abetting of Mieka's and Vadda's violations of
### Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

### (Blankenship)

60.  The Commission repeats and re-alleges *verbatim* Paragraphs 1 through  51 of the

Complaint as if fully set forth herein.

61.  Blankenship knowingly or with severe recklessness provided substantial

assistance to Mieka and Vadda in their violations of Section 10(b) of the Exchange Act and Rule

10b-5 thereunder.

62.  By reason of the foregoing, Blankenship aided and abetted Mieka's and Vadda's

violations and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the

Exchange Act and Rule 10b-5 thereunder.

### Fourth Claim

### Violations of Section 13(a) of the Exchange Act and
### Rules 12b-20, 13a-1, and 13a-13 thereunder

### (Vadda)

63.     The Commission repeats and re-alleges *verbatim* Paragraphs 1 through 51 of the Complaint as if fully set forth herein.

64.     Vadda misrepresented, failed to disclose, and omitted material information concerning Mieka and the 2010-JV in public filings made with the Commission.

65.   By engaging in this conduct, Vadda, whose securities are registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*], failed to file annual and quarterly reports on Forms 10-K and 10-Q that were true and correct, and failed to include material information in its required reports that was necessary to make the statements made in the reports, in the light of the circumstances under which they were made, not misleading.

66.     By reason of the foregoing, Vadda violated and, unless enjoined, will continue to violate Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13.

### Fifth Claim

### Aiding and abetting Vadda's violations of Section 13(a) of the Exchange Act
### and Rules 12b-20, 13a-1, and 13a-13 thereunder

### (Blankenship)

67.     The Commission repeats and re-alleges *verbatim* Paragraphs 1 through 51 of the Complaint as if fully set forth herein.

68.     Blankenship knowingly or with severe recklessness provided substantial assistance to Vadda in its violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13.

69.     By reason of the foregoing, Blankenship aided and abetted Vadda's violations and, unless enjoined, will continue to aid and abet violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### Sixth Claim

### Violations of Rule 13a-14 under the Exchange Act

### (Blankenship)

70.     The Commission repeats and re-alleges *verbatim* Paragraphs 1 through 51 of the Complaint as if fully set forth herein.

71.     By engaging in the conduct alleged above, Blankenship violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] when he certified Vadda's quarterly and annual reports on Forms 10-K and 10-Q, filed with the Commission, stating that those reports did not contain any untrue statements of material fact, or omit to state any material facts, and that they fairly represented in all material respects Vadda's financial condition, results of operations, and cash flows as of, and for the periods covered in each report.

72.     By reason of the foregoing, Blankenship violated and, unless enjoined, will continue to violate Exchange Act Rule 13a-14.

### Seventh Claim

### Control person liability under
### Section 20(a) of the Exchange Act

### (Blankenship)

73.     The Commission repeats and re-alleges *verbatim* Paragraphs 1 through 51 of the Complaint as if fully set forth herein.

74.     At all relevant times, Defendant Blankenship possessed, directly or indirectly, the power to direct and control, and in fact directed and controlled the management, general

operations, and policies of Mieka and Vadda, and was a control person of Mieka and Vadda pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].  Blankenship induced or was a culpable participant in Mieka's and Vadda's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and induced or was a culpable participant in Vadda's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

75.     By reason of his actions alleged herein, Defendant Blankenship is jointly and severally liable with Mieka and Vadda as a control person, pursuant to Section 20(a) of the Exchange Act, for Mieka's and Vadda's violations of Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder, and, unless enjoined and restrained, will continue to violate these provisions and rules.

### Eighth Claim

**Offers and sales of securities by an unregistered broker**
**Violations of Exchange Act Section 15(a)**

**(Myers and Romo)**

76.     The Commission repeats and re-alleges *verbatim* Paragraphs 1 through 51 of the Complaint as if fully set forth herein.

77.     Defendants Myers and Romo, while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act.

78.     Defendants Myers and Romo violated, and unless restrained and enjoined will in the future violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Enter an Order finding that Defendants committed, and unless restrained will continue to commit, the violations alleged in this Complaint;

(2)     Permanently enjoin Defendant Mieka and its agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(3)     Permanently enjoin Defendant Vadda and its agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13];

(4)     Permanently enjoin Defendant Blankenship and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)], and Exchange Act Rules 10b-5, 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13];

(5)     Permanently enjoin Defendant Blankenship and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly,

Exchange Act Rule 13a-14  [17 C.F.R. § 240.13a-14];

(6)     Permanently enjoin Defendant Blankenship and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from, directly or indirectly:
(1) soliciting any individual or entity to purchase or sell securities; and (2) participating in any oil and gas-related securities offering, by: i) preparing, directly or indirectly, any written or electronic offering materials for use in an oil and gas-related offering; ii) communicating, directly or indirectly, with investors about the status of their oil and gas investment(s), however, nothing herein shall prevent Defendant Blankenship from responding to investors about the status or performance of any oil and gas wells, so long as Defendant does not, directly or indirectly, initiate the communication with the investors regarding the status of the investment; iii) receiving, depositing, or effecting the initial disbursement of any proceeds from any oil and gas-related securities offering; and iv) directing, directly or indirectly, the receipt, deposit, or initial disbursement of any proceeds from any oil and gas-related securities offering; provided, however, that none of the foregoing shall preclude Defendant from purchasing or selling securities for his own account or participating in any oil and gas-related securities offering for his own account;

(7)     Order that Defendant Blankenship is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act  [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

(8)     Order Defendants Mieka and Blankenship to disgorge, jointly and severally, all ill-gotten gains and/or unjust enrichment realized by each of them, plus prejudgment interest;

(9)     Order Defendants Mieka, Vadda, and Blankenship to pay an appropriate civil

monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(10)    Order Defendants Myers and Romo to disgorge all ill-gotten gains and/or unjust

enrichment, plus prejudgment interest;

(11)    Permanently enjoin Defendants Myers and Romo and any of their agents,

servants, employees, attorneys, and all persons in active concert or participation with either of

them who receive actual notice of the injunction by personal service or otherwise, from violating,

directly or indirectly, Section 15(a) of the Exchange Act  [15 U.S.C. § 78o(a)];

(12)    Order Defendants Myers and Romo to pay an appropriate civil monetary penalty

pursuant to to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(13)    Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

(14)    Grant all other relief to which the Commission may be entitled.

Dated:  April 10, 2015.                          Respectfully submitted,

David B. Reece
Texas Bar No. 242002810
Timothy L. Evans
Texas Bar No. 24065211
SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6476 (phone) (dbr)
(817) 978-4927 (facsimile)


COUNSEL FOR PLAINTIFF UNITED STATES
SECURITIES AND EXCHANGE COMMISSION