# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § | |
| v. | § § | CIVIL ACTION NO. 4:15-CV-00300-ALM JUDGE MAZZANT |
| MIEKA ENERGY CORPORATION, VADDA ENERGY CORPORATION, DARO RAY BLANKENSHIP, ROBERT WILLIAM MYERS, JR. and STEPHEN ROMO | § § § § § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Securities and Exchange Commission's Motion for Partial Summary Judgment as to Defendants Robert William Myers, Jr. and Stephen Romo (Dkt. #32). The Court, having considered the motion, finds it should be granted.

## BACKGROUND

Between September 2010 and October 2011, Daro Blankenship ("Blankenship"), though his company, Mieka Energy Corporation ("Mieka"), and with assistance from Stephen Romo ("Romo") and Robert Myers, Jr. ("Myers"), raised almost $4.4 million from approximately 60 investors by selling interests in the "2010 Mieka PA/WestM/Marcellus Project II" (the "2010-JV"). According to the confidential information memorandum Blankenship prepared, Mieka's management would use these offering proceeds to drill and complete two gas wells—one horizontal, the other vertical—and the investors would receive, in return, production revenue from the wells. However, Blankenship depleted the offering proceeds by immediately applying them to expenses and projects unrelated to the 2010-JV, leaving insufficient funds to drill the horizontal well or complete the vertical well.

From 1981 to 1984, Robert Myers was CEO, president and owner of the Securities and Exchange Commission ("Commission")-registered broker-dealer Janus Securities, Inc. Myers joined Mieka in 2004 as a salesman. But Myers has not been registered with the Commission in any capacity, or associated with any Commission-registered entity, including any broker-dealer, since 1984. In May 2005, Stephen Romo joined Mieka as a salesman. Both Myers and Romo admit that, during the relevant period, they were not registered as brokers with the Commission or affiliated with a broker-dealer registered with the Commission. (Dkt. #14 ¶ 50); (Dkt. #13 ¶ 50).

Blankenship provided Myers and Romo with lead lists to recruit investors. Blankenship also required a particular approach to their sales efforts—brokers would begin by cold-calling potential investors from the lead lists, making introductions, and notifying the potential investor that they would be sending an introductory letter about Mieka to the investor. After sending the letter, the brokers would continue to call the potential investors to develop a relationship, generally discussing Mieka, its business, and the potential investor's investing history. During this time, Blankenship did not allow the brokers to discuss specific projects with the potential investors. After forty-five days had passed, the brokers would then send a pre-completed confidential information memorandum to the investor, using the information they had learned over the course of the previous phone calls. The memorandum would include the potential investor's contact information, investment history, qualification as an accredited investor, and other information.

Using these methods, for the 2010-JV and other projects, Myers received $165,453.47 in total commissions from Mieka in 2010 and $102,484 in 2011. Of these total commissions, Myer received $121,466 for selling the 2010-JV. Romo received $69,962 of commissions for his sales of the 2010-JV.

Blankenship prepared, or directed the preparation of, the written materials for each offering that were provided to investors ("Offering Documents"). Those documents included: (1) a confidential information memorandum that purported to describe generally how the venture would operate; (2) brochures summarizing the offering and used to pitch prospective investors; (3) a Joint Venture Agreement ("JVA") that designated Mieka as the managing joint venturer, with sole authority to bind the venture; (4) a subscription or application agreement that investors signed; and (5) an investor questionnaire. At all times, Blankenship had ultimate control and authority over the content of the Offering Documents and how the disclosures contained therein were communicated to investors.

The JVA appoints Mieka as the managing venturer and explicitly delegates management of the day-to-day JV operations to Mieka. As a result, Blankenship controlled nearly every aspect of the venture. Blankenship identifies the prospect, drafts the organizational documents and agreements, sets the offering and completion price, controls who is admitted to the venture, and extends the offering period at its sole discretion. The JVA specifically authorized the managing venturer to retain or act as operator, drill, complete, equip, test, rework, operate, recomplete and, if necessary, plug the well and abandon the prospect. Blankenship also had the authority to enter into operating and other agreements relating to the JV property. The JVA required the joint venture to pay "Management Fees" to the managing venturer "[i]n consideration of the supervision and management of the affairs of the Joint Venture . . . ." (Dkt. #32, Appendix Part 5 at 12). Thus, Blankenship had the power to make all of the significant decisions regarding the oil and gas activities that are the purpose of the 2010-JV.

Under the terms of the offerings, all decisions made by Mieka as the managing venture were binding on the joint venture, but investors could not bind the joint venture or act on its behalf. Blankenship could enforce this prohibition by filing suit.

From the outset of the investment, investors had no control over the price, terms, and counterparty of the factor most important to the success of the investment—the turnkey drilling and completion contract. Blankenship set these out in the confidential information memorandum before the offering commenced. It determined the form of the joint-venture agreement. Blankenship had the final authority to approve the information and disclosures in the confidential information memorandum; determined who the managing venturer would be; identified the prospective wells; and required the joint venture to enter a turnkey drilling contract at a fixed price with itself as the managing venturer. Also, the terms of the JVA were presented as non-negotiable.

Other than removal of the managing venturer, which requires a vote of 60% of the interests, the JVA specifies few matters that required a vote. Acts such as assignment of the JV property for the benefit of a creditor, confession of judgment, and submission of claims to arbitration or litigation require unanimous approval. The managing venturer controls access to information regarding the JV, who can condition disclosure of the books, records, and reports upon a showing of a "proper purpose" by the partner. Investors had no insight into how the votes would be calculated, or what any other investor voted.

Several barriers inhibited the investors' ability to exercise their power of removal. Blankenship could restrict access to the JV's books and records, thus preventing partners from communicating with one another to marshal the required 60% votes. Further, the investors are numerous, geographically dispersed, and have no prior relationship to one another, which also impedes their ability to organize and exercise their removal power. Investors had no access to

information except through Blankenship, and no way of initiating a vote. It was, therefore, practically impossible for investors to confer with each other and organize to vote to replace Mieka.

Blankenship took the funds raised from the 2010-JV and commingled them into his own account at the outset of the investment. Thus, had the JV partners attempted to remove the managing venturer, the venture would have been left without sufficient funds to conduct their intended business. Further, Mieka's management was entitled under the JVA to execute documents and hold interests in their own names. Thus, if the JV partners tried to remove Mieka, they would have not possessed the working interest. As a result, from the outset of the investment, the investors had no realistic alternative to Mieka as managing venturer.

As a condition to acceptance as an investor in these ventures, the JVA required the purchaser to agree to the JVA as written, including the appointment of Mieka as managing venturer. Prospective investors had no ability to negotiate the terms, which were presented on a take-it-or-leave-it basis. Mieka's salesmen, including Myers and Romo, did not seek out investors with managerial experience in oil and gas drilling operations and instead marketed the investments to the general public using generic lead lists and other general solicitation efforts, ultimately raising over $4 million from around 60 investors in 21 states. Those who purchased the investments were scattered throughout the United States, had no prior relationships with or contact information for each other, and lacked experience in and knowledge about oil and gas exploration. Thus, investors were dependent on Mieka's efforts for profits, as they understood from the outset of the investment.

The confidential information memorandum for the 2010-JV misled investors about the expected use of offering proceeds. It said that the funds raised would be paid to Mieka to be used to cover "all costs associated with the Venture's acquisition of interests in the Prospect Wells and the Working Interests in connection with the drilling, testing and Completion of the undrilled Prospect Wells and pay all Organization Costs . . . ." (Dkt. #32, Appendix Part 4 at 17). In reality,

of the $4.4 million raised, Blankenship used only approximately $850,875, or 19%, for 2010-JV business purposes (drilling, testing, and completing the wells). Blankenship spent the remainder of the funds on other expenses, including on Mieka projects other than the 2010-JV.

On September 2, 2016, the Securities and Exchange Commission filed this Motion for Partial Summary Judgment as to Defendants Robert William Myers, Jr. and Stephen Romo (Dkt. #32). Myers and Romo never responded to the motion.

### LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or

defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "'significant probative evidence'" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but must "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Two issues are before the Court: (1) whether investments sold by Defendants Myers and Romo were joint-venture interests or securities; and (2) if the investments were securities, whether Myers and Romo acted as brokers without being registered with the Commission?

Section 15(a) of the Securities Exchange Act of 1934 prohibits someone from acting as a broker without registering with the Commission. Myers and Romo admit that they were offering and selling interests in an investment with Mieka while unregistered with the Commission as brokers. (Dkt. #13, ¶ 50); (Dkt. #14, ¶ 50). Section 3(a)(4) of the Exchange Act defines "broker"

7

to include "any person engaged in the business of effecting transactions in securities for the accounts of others." 15 U.S.C. § 78c(a)(4). "Section 15 does not define the term 'engaged in the business,' but courts have defined it as 'being engaged in the business' of 'effecting transactions in,' or 'buying and selling,' securities." *SEC v. Arcturus Corp.*, 171 F. Supp. 3d 512, 524 (N.D. Tex. 2016). The Exchange Act does not define the term "effecting transactions," but courts consider various factors, including whether the person: (1) solicited investors to buy securities; (2) was involved in negotiations between the issuer and the investor, and (3) received transaction-based compensation. *SEC v. Helms*, 2015 WL 5010298, at *16–17 (W.D. Tex. Aug. 21, 2015). Indeed, courts perceive "transaction-based compensation" to be a hallmark that a person is a broker. *See SEC v. Gagnon*, 2012 WL 994892, at *11 (E.D. Mich. Mar. 22, 2012) (finding unregistered broker where defendant solicited the purchase of securities as "the link between the issuer and the investor," and received transaction-based compensation).

The Commission argues that Myers and Romo were conducting themselves as brokers when offering and selling the interests: they were cold-calling potential investors from lead sheets purchased by Blankenship; developing relationships by discussing the potential investor's investment history over a period of weeks; recommending investment with Mieka; sending Mieka's Offering Documents to potential investors; taking orders after successfully closing a sale; helping investors with corresponding paperwork; and, most telling, receiving transaction-based compensation for their efforts. The Court finds that under the *Helms* analysis, Myers and Romo were acting as unregistered brokers. 2015 WL 5010298 at *16–17. The only truly contested issue here is what they were selling—joint-venture interests or securities.

Under the federal securities laws, a broker is only a broker if they are selling securities. Sections 2(a)(1) of the Securities Act of 1933 and 3(a)(10) of the Securities Exchange Act of 1934

define "securities" to include "investment contracts." 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10). An investment contract exists where: (1) individuals are led to invest money; (2) in a common enterprise; and (3) with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves. *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99 (1946). The only aspect of the *Howey* test at issue here is whether the investors were dependent on the efforts of others for their expected financial return. In *Williamson v. Tucker*, the Fifth Circuit established a test to indicate whether investors in a purported general partnership or joint venture expected to depend on the efforts of others, thus satisfying the third *Howey* element. 645 F. 2d 404 (5th Cir. 1981). Under *Williamson,* an investment contract exists if one of the following three factors is present: (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers. *Id.* at 424. The Commission need only establish one of the three *Williamson* factors. *Arcturus Corp.*, 171 F. Supp. 3d at 524 (citing *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 756 (11th Cir.2007) ("the presence of one of the three *Williamson* factors renders even a general partnership interest an investment contract.")).

On its face, the investment Myers and Romo were selling was a joint venture. But even a cursory review of the Offering Documents and the relationship between Mieka and the investors reveals the truth—Blankenship wholly dominated the investment, while the investors, some of whom had no experience with oil and gas, had no real power, were prevented from exercising any

9

of the scant authority afforded to them under the Joint Venture Agreement, and depended entirely on Mieka's managing of the business. At the outset of the investment, the investors expressly delegated the management of the operations of the JV to Mieka, the managing venturer (Dkt. #32, Appendix 1 at 130). Investors relied entirely on Mieka for the success of the JV because Blankenship controlled the drilling of the wells and all aspects of the contracts including the price and terms. The investors were unable to exercise any illusory managerial powers they may have had because Blankenship did not provide any information about the identity of other investors or provide meaningful access to the operative books and records of the JV (Dkt. #32, Appendix 5 at 192). The JVA permitted investors to call a meeting upon written request of 10% of the shares of the JV, yet Blankenship did not provide the investors with the means to determine ownership identity and share percentages. This case is strikingly similar to *Arcturus*, where the joint venturers also had the hollow and illusory ability to call meetings and the voting power to remove the managing venturer. *SEC v. Arcturus*, 171 F.Supp.3d 512, 525 (N.D. Tex. 2016). The *Arturus* court pointed out that "[i]f the venturers did not have any contact information for the other venturers . . . how could the venturers ever satisfy the minimum percentage interest to exercise these powers[?]" *Id.* The court concluded that "[a]ny right to vote or call a meeting that required a percentage of the venture interest was absolutely hindered by the inability of the venturers to contact each other." *Id.*

Even if the investors had access to the requisite information to exercise management rights, which they did not, the third *Howey* element would be satisfied because the investors did not have the knowledge to intelligently exercise their rights. The Fifth Circuit has held, "Access to information does *not* necessarily protect an investor from complete dependence on a third party where, as here, that same third party is the sole source of information and advice regarding the

underlying venture and the investor does not have the expertise necessary to make the essential management decisions himself." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 135-36 (5th Cir. 1989). The investors—who were targeted by purchased lead lists and unsolicited calls—had little to no expertise in the oil and gas industry (Dkt. #32, Appendix 1 at 3). Therefore, the summary judgment record establishes that the majority of the investors' powers were delegated to Mieka, and any power the investors still possessed could not be exercised because Blankenship controlled the necessary information. Because the first *Williamson* factor proves the investors' dependence on Mieka, the Court finds the third *Howey* element is established. *See Williamson*, 645 F.2d at 424. Accordingly, Mieka's joint venture is an investment contract and, therefore, a security. *See Arcturus*, 171 F.Supp.3d at 527.

Because the 2010-JV interests were securities, and because Myers and Romo were acting as brokers, they should have registered with the SEC. And because they admit that they were not registered, they violated Section 15(a). The SEC's motion should therefore be granted.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff Securities and Exchange Commission's Motion for Partial Summary Judgment as to Defendants Robert William Myers, Jr. and Stephen Romo (Dkt. #32) is hereby **GRANTED**.

**SIGNED this 4th day of May, 2017.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE