**United States Magistrate Judge Kimberly C. Priest Johnson**
Courtroom 108 of the U. S. Courthouse
7940 Preston Road, Plano, TX 75024                                    January 17, 2017

**Re: Confidential mediation statement for Plaintiff Robert William Myers, Jr., Case 4:15-cv-300 ALM**

Thank you for reviewing my statement. The SEC indicated that I made my contacts through cold calling which is inaccurate as most of my prospects were already partners with me or referrals from these existing partners, most were with me from the period 10-25 years previous to joining Mieka Corporation.  Contacts with prospects that were called by our venture reps  were brought to me because I may have contacts in the prospects field of business or I was assigned to work with them because their Venture Rep was no longer with Mieka.  Company policy was to wait 45 days after the initial contact before issuing a letter regarding any specific project and my contact was normally after that letter was issued.

The testimony by William Wilson is misleading as he seems to indicate that I sold him an investment on our project. That did not happen because the Venture rep that he invested with him later left Mieka after Mr. Wilson was already a partner, and I was then asked to be his contact at Mieka. I never met the man but answered his questions when he called. When he came to the office he visited with Daro Blankenship. I do note in his testimony that he has an MBA in business and didn't know what he was investing in?? I find it highly unlikely that he didn't know the value of his investment at least. I would like to see testimony from my own partners as to my presentations to them.

If I was a judge looking at the SEC case I would assume that I, Robert William Myers, Jr. would be in a position to influence the day to day operations at Mieka. This is far from the truth as I was not involved in the Marcellus II project decision making and was kept in the dark along with the other Venture Reps as to the contracts Mieka and Daro Blankenship had with Dannic.

The venture representatives, Mr. Romo and I were led to believe the Marcellus II project was second to none by Daro Blankenship; specially since we didn't have to drill the vertical shafts as they had already been drilled and logged by Danny Sinclair through his company, Dannic Energy. We were told that we should expect positive results given the Developmental and Management team of Terrell Dobkins with over 30 years experience in natural gas wells, Thomas Harris one of the elite in the oil and gas industry with 30 years of experience and Nick Steinsberger who was responsible for a 250 well program in the Barnett Shale and the geologist overseeing the first water fracs in the Barnett shale formations for Mitchell Energy and Development.

I and the others were shown on the geographical maps that a pipeline was present to connect the Marcellus wells. We were not told that the pipeline couldn't handle our production and that the closest pipeline that could was 4 miles away. We were also assured that any pipeline construction would be Dannic's part of our project. I believe that Danny Sinclair and his company Dannic tried to extort Mieka which, I believe, ultimately led to this SEC lawsuit. The actions by Danny Sinclair, Daro Blankenship and others at Mieka Corporation greatly damaged my reputation, and cost my clients both time and money.

**Robert Myers**

Since your knowledge of who I am is limited to the SEC filings, I would like to give you some background that led to this case, but not critical legal arguments. You may have noted in your perusal of this case that I have had previous series 22, series 65 and series 39 licenses.  I was part owner (10%) of Federal Energy Corp.(FEC) from 1975 - 1981. It was in about 1978 that Joel Held became our counsel. FEC was drilling and producing wells in Texas and I was able to set the offering prices. I invested with my partners until the majority owner and Mr. Held informed me that they had decided to add several hundred thousand dollars to the offering price. I refused to sell the projects and we worked out a buyout and 1 year non-compete.

I met a landman who had three leases in Kansas that looked promising. I started Janus International and Janus Securities in 1982 to drill three wells on those leases. We failed to capitalize the project and we returned all investor funds. I then closed the companies. Several of those investors wanted me to have one well drilled near Hill City, KS so we pooled our monies to drill the well. We hit a giant well and all of the partners had received their entire investment back in the first 90 days. Because of this success we drilled a total of 11 wells, 7 successful. In 1986 Oil prices fell under $10 per barrel and I ceased drilling any more wells.

I moved to California in 1987 to be close to my sister and my two nieces. During that time I continued to operate the Kansas wells. In 1991 the past owner of FEC contacted me and asked if I would help him with some projects he was looking into. I agreed on conditions that if I didn't like any of the projects that I wouldn't offer them to my contacts. I moved back to Dallas and after about 60 days I told him I could not represent his company.

It was around then that I was contacted by past associates who needed funds for a restaurant called Kirby's Steakhouse. I introduced them to some interested parties and they invested. I started a company, Myers Operations, to operate the Kansas wells as my main source of income and to oversee any of the fund raising opportunities being presented to me. Later I was presented with an opportunity to raise funds through a private offering for Sports Net, Inc. Sports Net was developing software for PAF, a cruise line out of Finland. The software project was highly classified as it was to run the gaming operations for PAF. The offering looked great, even Sun Microsystems was donating hardware just to have stock in Sports Net. Myers Operations received stock and compensation in lieu of funds spent by my contacts. Sports Net lost their contract in a legal battle that went to an international court in Stockholm, Sweden.

I was forced into a personal bankruptcy in 1996. My income after that was a salary from Myers Operations as the wells were still generating income. The wells were sold in 2001. In 2002 I was presented with the opportunity to assist a chemical coating company, still in operation, called Reactive Surfaces . Several of my contacts invested in this company,

In 2003 I was looking for a legitimate Oil and Gas company to represent to my contacts who had been with me for 10 to 25 years.  I wanted a company which offered professional projects while having set

high standards to maintain and operate their projects under SEC guidelines. I missed being involved with the drilling and production of wells but I didn't want to be on- site as I was on my Kansas wells.I began looking into Mieka Corporation and found out they were represented by Joel Held and I knew that the companies represented by Mr. Held were acting under SEC guidelines. I knew this because of my past association with Mr. Held. I decided to join Mieka for several reasons:

1)  Their partnership with West Star Oil out of Midland, TX. Ted Rose and his wife Sherri were well respected in the oil business and were overseeing the drilling and completion operations on the Pennsylvania gas wells.

2)  The company was represented by Joel Held and was operating successfully under SEC guidelines.

3)  The board of directors and references were impressive with General Paul Martin who was over the Electronic Security Command at the Pentagon, Richard Smith with NATO, prominent Physicians and Ted Rose.  General Martin even spoke with the venture representatives applauding Mieka and their projects and management.

4)  Some of the prominent invested partners who have extensive energy expertise like a vice-president of Peabody Coal, Exxon Mobile geologist and several other independent geologists.

Even with credentials like this I did not bring in any of my previous contacts until November, 2004 as I wanted to see how Mieka operated their business from the inside. In fact, Mieka only stayed with me because I was working for free during this period. After I brought some of my contacts into their projects I was offered a vice-presidential position. Before Mr. Blankenship got cancer in 2006, Mr. Held retired and an associate of his became our attorney, Larry Mandela. We continued to raise funds and drill around 15 wells while Mr. Blankenship recovered from his operations.

In 2006, 10 years after my bankruptcy, I had the opportunity to purchase my first home. It was an exciting time as we drilled and produced income to our partners on 21 wells in Pennsylvania with Mountain V Oil based out of West Virginia. I was making good money and our investors were happy with their returns.

Mr. Blankenship wanted to drill wells in Kentucky and I disagreed with his assessment of the prospects and he ignored my input. This was the first time that I understood that my title was in name only. The first well we drilled turned out to be pretty good so I gave him the benefit of the doubt on the Kentucky wells. The results on the next wells were mixed but with oil prices near $100/barrel and the drilling and operating costs low, I allowed some of my contacts to invest. Then in 2008 oil prices dropped from $140/barrel in July to $35/barrel in December and the Kentucky wells were no longer profitable. Our workforce became minimal with Mr. Blankenship, Mr. Romo and I overseeing the operations.

That was when Mr. Blankenship came up with the idea of putting all of our wells under a shell company, Vadda,  offering stock in Vadda to our partners in proportion to their investment positions. Mr. Romo was made a vice president at that time so that he could make the offering to his partners. The partners voted to exchange their working interests for stock in Vadda. Mr. Blankenship felt that after an audit of

Vadda we could offer the stock under a secondary offering and our partners would be the beneficiaries of that offering. Unfortunately the auditors took twice the time that we expected it to take and they erred in the value of our reserves. The secondary offering never took place as the value of our assets were miscalculated.

I asked Mr. Blankenship to pursue Marcellus Shale Formation wells. He was able to secure leases and hire a formidable team of shale formation experts. We put together a 2 well project, Marcellus I, and drilled the first well. Nick Steinberger our geologist oversaw the drilling and logging and all looked good for our partners. We fracked the well but the pressures weren't what we expected with minimal production levels.  Mr. Blankenship said that he was concerned about the prospects of having the same results on the #2 well on this lease and did not want to waste any of the partners money.

It was at this time that Mr. Blankenship was approached by Danny Sinclair with Dannic Energy. Mr. Sinclair offered to sell some wells that had already been drilled and logged but not fracked. I was not aware of this contact until Mr. Blankenship and Mr. Sinclair made a deal on those wells. One of those wells was then offered to the partners as a replacement well for the #2 location and we contacted the partners to let them know that the risk of drilling and missing the Marcellus pay zone had been removed because of the success on the replacement well and that Dannic Energy would connect us to the pipeline after a successful frack. The partners voted to replace the #2 well in the Marcellus I project with the replacement well.

In the meantime,  Mr. Blankenship put together the Marcellus II project which would consist of two wells already drilled and logged by Dannic Energy and we would only have to frack one well and directional drill and frack the second. We were led to believe that Dannic would complete the pipeline so we would be able to produce our wells.  We had a successful Frack on the replacement well on the Marcellus I project and was able to fund the Marcellus II.  Mr. Sinclair was to run the pipeline, but he tried to railroad Mieka and our partners into signing a contract where he would receive unreasonable compensation for his efforts. These facts were not made known to the Venture Reps so we were still excited about the expected profits to our partners in the Marcellus projects and began preparing for Miekas' next projects.

When the banking crisis hit we were now told of the problems with Mr. Sinclair and Dannic Energy. I could have left Mieka at this time but I have an obligation to my partners. I wanted to be where I could follow the efforts of Mieka to resolve this problem with Mr. Sinclair and finish the Marcellus projects. My income was less than $50,000 in 2013, and I lost my home to foreclosure. I was just getting a small salary at the time. But I didn't abandon my partners.

When I was informed of this suit by the SEC, I didn't feel that they had a case against us, because of our attorney Larry Mandalas' opinions as to our offerings not being securities.  I continued getting a small salary but ceased to sell interests in Miekas projects. I stayed on with Mieka so that I could be there for my partners. When I was made aware by Mr. Blankenship that there wasn't funds available to complete Mieka's projects, I resigned. I could not continue to represent Mieka. I notified my partners of my decision.

**Settlement Efforts**

Because I felt that Mieka and Mr. Blankenship pulled me into this SEC suit I told him to have his attorneys at Munck Wilson represent me. They assigned Walter Herring to represent me.  I found out that Munck Wilson  only had Mieka and Mr. Blankenships interests in mind. I was given a choice of signing a proposal by the SEC or else. I told Mr. Herring that I had no money to pay the monies that the SEC wanted me to pay and I was told that it wasn't a problem and that a Judge would lower my amount when it became apparent that I was financially incapable of paying the SEC proposed amounts. This was heavy on my heart and I agreed to read and consider the SEC offer. When I saw that I would be signing saying that I had ill gotten gains from the Marcellus II project, I refused to sign. I never asked my partners to invest for only my own gain, but for their chance to profit from the projects. I would be willing to take a lie detector test to prove my mindset. Over the last 5 years I have been approached by other companies to bring my contacts. One company offered to set up my own company with a big salary. I refused their offers.

I told Mr. Herring that I felt that I should find another attorney to represent me and March 23, 2016 the court granted the motion for Munck Wilson to withdraw from representing me. I didn't find another attorney who would represent me because I didn't have enough money to hire them. I even went to Mr. Romos attorney to no avail. I still lack the funds to hire an attorney and will have to represent myself. I will have to be the authorized representative for myself. If there is any form I need to fill out in regard to being authorized, please inform me.

I believe this matter should be dismissed. If a mediation settlement is needed my position is that over the next 8-12 months I might be able to save $20,000 for a potential offer. My car is a 2003 Lincoln Towncar and my wife has a 2006 Mercedes with $7,500 still owed on it. We are living in an apartment and getting Social Security. I am 72 years old and she is 67. I'm currently working with an Oklahoma Water Clarification company and netted about $60,000 in 2016. My wife works and volunteers at our church and makes about $5,000 per year. We have over $50,000 in credit card and automobile debt. We tithe 10% and have around $5,000 in monthly expenses to break even. With around $2,500 in my checking and savings account combined, you may say my wife and I are just making it. I wish things were different.

Respectfully,

Robert W. Myers Jr.